**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
***(Electronically Filed)***

| | | |
|---|---|---|
| BRIGHTVIEW LANDSCAPES, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| | : | |
| ROLAND GABRIEL, | : | |
| | : | |
| Defendant. | : | |

# VERIFIED COMPLAINT

Plaintiff BrightView Landscapes, LLC ("BrightView"), by and through its undersigned counsel, and for and in support of its Complaint against Defendant Roland Gabriel ("Gabriel"), hereby avers as follows:

## I. Introduction

1. BrightView is one of the nation's leading commercial landscape companies. It provides a wide array of landscaping and maintenance services, including, but not limited to, landscaping design; landscaping maintenance; snow and ice removal; water and irrigation services; and tree care. Its customers include corporate campuses, sports stadiums, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

2. BrightView employed Gabriel as a Branch Manager from December of 2022 until he was terminated in January of 2026, although he had been employed by BrightView in various capacities since 2014. At BrightView, a Branch Manager oversees all aspects of branch operations, including compliance, safety, efficiency, customer service, and profitability. As such, Gabriel was responsible for overseeing all the work BrightView did for dozens of commercial property owners

in and around Cincinnati, including some of BrightView's most significant clients in the region. Gabriel's responsibilities included ensuring the overall financial success of the branch, developing annual budgets, tracking branch performance, ensuring timely and accurate billing and customer retention efforts, and promoting employee development.

3. The Cincinnati Branch was highly successful, generating approximately $4 million in revenue annually.

4. BrightView has strong customer relationships that typically include contract renewal rates in excess of 80 percent. Gabriel benefitted from the goodwill, reputation, and name recognition generated by BrightView's efforts to develop these aspects of its business over the years.

5. By virtue of the extensive training and investment BrightView made in Gabriel over his four years with the company, and the confidential, proprietary and trade secret information to which he had access and used, Gabriel gained extensive knowledge of BrightView's customer relationships (both his own and those of the employees he managed), the specific needs of customers, BrightView's business operations, and its business and pricing strategies, all of which are confidential information.

6. In fact, Gabriel knows confidential details regarding every aspect of BrightView's relationships with BrightView's largest and most critical customers, including both the reasons for BrightView's successes with those customers and any vulnerabilities in those relationships. Gabriel not only knows the right person to contact at each customer location, but he also knows confidential details about their particular needs and requirements.

7. In addition, Gabriel is knowledgeable about all aspects of BrightView's operations, especially those of the Cincinnati Branch, such as vendor sources, employee information,

confidential marketing strategies, and pricing and other financial information, all of which would give an unfair competitive advantage to a competitor, like ULS, if exposed.

8. The confidential information that Gabriel knows includes, but is not limited to, the identities of the precise individuals at BrightView's customers who make purchasing and contracting decisions; the annual spend of its customers; service issues, if any, that such customers may be encountering; BrightView's labor costs; BrightView's project estimator model; BrightView's pricing; discounts, rebates, and pricing that BrightView receives from vendors; and BrightView's target profit margins.

9. All of the foregoing information would be of tremendous value to a competitor.

10. In light of Gabriel's role as a steward of BrightView's customer goodwill and the necessity of giving him access to BrightView's most sensitive competitive information, BrightView required as a condition of his employment that Gabriel execute a Confidentiality, Noncompetition, and Nonsolicitation Agreement ("Agreement"), which Gabriel signed on December 15, 2022. A true and correct copy of the Agreement is attached hereto as Exhibit A.

11. Gabriel's Agreement with BrightView contains several restrictive covenants to protect BrightView's legitimate interests, including a narrowly drawn non-competition clause prohibiting Gabriel for one year from working in similar capacity for a competitor in the territory he covered for BrightView. *See* Agreement at § 5. In addition, Gabriel's Agreement contains a two-year non-solicitation restriction that provides he may not "directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate, any Customer or accept any business from any Customer with whom [Gabriel] had Material Business Contact" in the last two years of his BrightView employment. *See* Agreement at § 6.

12. On January 9, 2026, BrightView terminated Gabriel's employment. During his exit interview, BrightView reminded Gabriel of his non-competition and non-solicitation obligations, which Gabriel stated that he intended to honor. At that time, Gabriel signed a separate confidential separation of employment agreement in which BrightView agreed to pay him eight (8) weeks of severance pay in exchange for Gabriel's agreement, *inter alia*, to "continue to abide by all … covenants contained in any Post-Employment Agreement you signed with the Company, which remain in full force and effect and are incorporated herein by reference."

13. Although Gabriel had promised to honor the restrictive covenants in his Agreement, BrightView recently discovered that Gabriel has been working as an account manager for GroundSystems, a major competitor of BrightView in the Cincinnati area.

14. BrightView wrote to Gabriel and GroundSystems on May 20, 2026 to demand certain information and assurances. In its letter to Gabriel, BrightView reminded him of his contractual obligations under the Agreement, specified the precise boundaries of the restricted territory where he is not permitted to work under his non-competition covenants, and asked for information on his employment status and responsibilities with GroundSystems to determine whether he was working in his restricted territory. BrightView sent a similar letter to GroundSystems to ensure that it was aware of Gabriel's contractual obligations, to understand the details of his employment with it, and to solicit its assurances that GroundSystems would take steps to ensure that Gabriel's responsibilities would not cause him to breach his obligations to BrightView.

15. Gabriel neither responded to BrightView's letter, nor its follow up email message after the deadline for his reply came and went. Although GroundSystems responded to BrightView, it refused to identify the territory to which Gabriel has been assigned, and its obstinate

refusal to specify where Gabriel was being employed persisted even after BrightView made several follow inquiries. As a result, and based upon the reasonable inferences to be drawn from the fact that neither Gabriel nor GroundSystems will answer direct questions about whether Gabriel is working in his "Restricted Territory" under the BrightView Agreement, it is apparent that Gabriel is knowingly and intentionally working in the narrow territory where he agreed he would not compete with BrightView for one year following his termination.

16. Gabriel's breach of contract threatens BrightView with irreparable injuries relating to the loss of its goodwill and the misuse and disclosure of BrightView's confidential information.

17. BrightView therefore brings this action to enforce its rights and to protect its goodwill and confidential information.

## II. The Parties

18. BrightView is a limited liability company organized under the laws of the State of Delaware. BrightView's principal place of business is located at 980 Jolly Road, Blue Bell, Pennsylvania 19422.

19. BrightView's sole member is BrightView Holdings, Inc., a corporation organized under the laws of the State of Delaware with its principal place of business located at 980 Jolly Road, Blue Bell, Pennsylvania 19422.

20. Gabriel is an individual who is a citizen of the State of Indiana residing at 8040 Harbor Walk Place, Indianapolis, Indiana 46237.

## III. Jurisdiction and Venue

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22. Attached hereto as Exhibit A is a true and correct copy of the Agreement executed by Gabriel that is the subject of this action.

23. The Agreement provides that any "any and all actions or proceedings by BrightView to enforce this Agreement may be brought in the State and/or Federal Courts located in or serving Blue Bell, Pennsylvania" and that such courts "shall have in personam jurisdiction . . . for the purpose of litigating any dispute, controversy, or proceeding arising out of or relating to this Agreement." *See* Agreement at § 12.

24. Venue is proper in this district pursuant to 28 U.S.C §§ 1391(b)(2) and (b)(3) because it is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and because the defendant is subject to the court's personal jurisdiction.

25. With respect to venue, the Agreement provides "[e]ach party waives any right it may have to assert the doctrine of forum non conveniens . . . or to object to venue" and "stipulates that the State and Federal courts located in or serving Blue Bell, Pennsylvania shall have . . . venue . . . for the purpose of litigating any dispute, controversy, or proceeding arising out of or related to this Agreement." *See* Agreement at § 12.

## III. Factual Background

### A. BrightView's Business.

26. BrightView is a landscaping business that traces its roots back to 1939. It was originally founded by Theodore Brickman, Sr., who started a landscape company called "Brickman Group, Ltd." Over the decades that have passed since, the company continued to add services until 2014, when it merged with ValleyCrest Landscape Companies. The combined companies became known as BrightView, and today, BrightView provides landscaping and maintenance services throughout the United States.

27. BrightView helps its customers design landscapes that are both beautiful and functional. Once designed, BrightView develops and implements the projects to turn the designs into reality.

28. BrightView also maintains its customers' landscapes, and its maintenance services are extensive. They include fertilization, lawn care, tree care, weed and pest management, storm preparedness, water and irrigation management, and snow and ice removal services.

29. BrightView serves many different markets. Its customers include corporate campuses, sports stadiums, retail shopping centers, places of worship, museums, universities, casinos, amusement parks, public parks, private homeowner associations, and many other public and private businesses.

30. In short, BrightView is national business providing extensive landscaping and maintenance services to customers engaged in diverse businesses.

**B. Gabriel's Agreement with BrightView.**

31. Given the extensive goodwill with customers of and customer prospects for BrightView with which Gabriel was entrusted – along with the tremendous amount and significant sensitivity of confidential and proprietary business information that was shared with Gabriel and to which he was given access – BrightView required him to execute the Agreement that is the subject of this action.

32. BrightView conditioned Gabriel's employment as a Branch Manager upon his acceptance of the terms and conditions set forth in the Agreement.

33. In Section 3 of the Agreement, Gabriel agreed that he would not use or disclose BrightView's "Confidential Information" except on behalf of BrightView and in furtherance of its business:

> **<u>Non-Disclosure and Non-Use of Confidential Information and Trade Secrets</u>.** During the term of team member's employment and following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, except as authorized and required to perform team member's duties for BrightView, directly or Indirectly: use, disclose, reproduce, distribute, or otherwise disseminate BrightView's Confidential Information and Trade Secrets, or take any action causing or failing to prevent any such information to lose its character or cease to qualify as Confidential Information or a Trade Secret. . . This prohibition applies regardless of whether the Confidential Information or Trade Secret was acquired before the effective date of this Agreement or thereafter.

*See* Agreement at § 3.

34. The Agreement defines the term "Confidential Information" in pertinent part as follows:

> **"Confidential Information"** means (i) competitively sensitive information, (ii) of importance to BrightView, and (iii) that becomes known to team member through his or her employment with BrightView. Confidential Information includes Trade Secrets, but an item of Confidential Information need not rise to the level of Trade Secret in order to be protected from disclosure by this Agreement. Confidential Information includes, but is not limited to, information about: BrightView's operations, services, and research and development of BrightView's operations or services; names and other listings of current or prospective Customers, proposal to any current or prospective Customers, the terms of any arrangements or agreement with any Customers, including payment and pricing information, and the implementation of Customer-specific projects; the composition or description of future services that will or may be offered by BrightView; marketing strategies; financial and sales information; and the technical expertise and know-how developed by BrightView, including the unique manner in which BrightView conducts its business. Confidential Information also includes information disclosed to BrightView by any third party (including, but not limited to, current or prospective Customers) that BrightView is required to treat as confidential.

*See* Agreement at § 1(c).

35. In Section 5 of the Agreement, Gabriel agreed that he would not compete with BrightView for a period of time in a limited geography upon the termination of his employment with BrightView:

> **Non-Competition.** Team member agrees that during team member's employment and for a period of one (1) year following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, directly or Indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Restricted Territory where doing so will require team member to provide the same or substantially similar services to a Competing Business as those that team member provided to BrightView during the Look Back Period o[r] such other services that would result in the use or disclosure of Confidential Information. The foregoing is also limited to providing services in the area(s) of BrightView's business as to which team member had material business related involvement or received Confidential Information during the Look Back Period.

*See* Agreement at § 5.

36. The Agreement defines a "Competing Business" as "any individual (including team member), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise that is the same as, or substantially the same as, any part of the Business of BrightView, or that is taking material steps to engage in such Business." *See* Agreement at § 1(b). The "Business" of BrightView is defined as "providing landscape and snow and ice removal services to Customers throughout the United States and abroad, including landscape and sports turf design, construction, maintenance, and enhancement, tree care, water management and irrigation, and snow and ice removal." *Id.* at § 1(a).

37. The Agreement defines the "Look Back Period" as "the two (2) year period preceding the voluntary or involuntary termination of team member's employment with BrightView for any reason." *See* Agreement at § 1(d).

38. The Agreement defines the "Restricted Territory" as "the geographic territory in which team member worked, represented BrightView, or had Material Business Contact with BrightView's Customers in the Look Back Period." *See* Agreement at § 1(g). "Material Business Contact" means "contact that is intended to establish or strengthen a business or professional relationship for BrightView, regardless of whether the contact is with a Customer directly assigned to team member or a Customer with which team member otherwise has contact in furtherance of the team member's job duties." *Id.* at § 1(f).

39. In Section 6 of the Agreement, Gabriel promised that he would not solicit, directly or "Indirectly," BrightView's "Customers" as follows:

> **Non-Solicitation of Customers.** Team member agrees that during team member's employment for a period of two (2) years following the voluntary or involuntary termination of team member's employment for any reason . . ., team member will not, either on behalf of team member or for any Competing Business, directly or Indirectly solicit, divert, or appropriate, or attempt to solicit, divert, or appropriate any Customer or accept any business from any Customer with whom team member had Material Business Contact in the Look Back Period, for the purposes of providing services that are the same as or substantially similar to those provided in the Business of BrightView.

*See* Agreement at § 6.

40. The Agreement defines "Customer" as "those individuals, companies, or other entities for whom BrightView has provided or does provide products or services in connection with the Business of BrightView or to whom BrightView has provided written proposal concerning the Business of BrightView and as to which team member has had Material Business Contact or received Confidential Information [during the Look Back Period]." *See* Agreement at § 1(d). By agreeing not to solicit Customers directly or "Indirectly," Gabriel agreed that he would not "assist others in performing or direct or control others to perform activities" that he "is prohibited from engaging in directly pursuant to the terms of this Agreement." *See id.* at § 1(e).

41. In the Agreement, Gabriel agreed that his restrictive covenants were reasonably designed to protect BrightView's legitimate interests in protecting its goodwill and Confidential Information, and further, that any breach of the restrictive covenants would cause BrightView serious and irreparable injuries for which injunctive relief is the appropriate remedy:

> **Relief, Remedies, and Enforcement.** The parties acknowledge that BrightView is engaged in a highly competitive business and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect BrightView's legitimate business interests, including Company goodwill and Customer and other business relationships, Confidential Information and Trade Secrets, and the specialized skills and knowledge gained by team member . . . during their employment. Team member acknowledges and agrees that a breach of any provision of this Agreement by the team member will cause serious and irreparable injury to BrightView that will be difficult to quantify and which may not be adequately compensated by monetary damages alone. Thus, in the event of a breach or threatened breach of this Agreement by team member, BrightView shall be entitled to injunctive relief, both temporary and final, enjoining and restraining such breach or threatened breach, despite any agreement between the two parties to arbitrate any disputes related to any aspect of team member's employment.

*See* Agreement at § 13.

**B. Gabriel's Employment with BrightView.**

42. Gabriel began his career with BrightView in 2017 as an Account Manager, until he was promoted in December of 2022 to Associate Branch Manager of the Cincinnati office, and to Branch Manger of the Cincinnati office in January of 2024.

43. In his role as Branch Manager, Gabriel had responsibility for all aspects of BrightView's operations in the region. As a result, the geography where Gabriel worked, represented BrightView, or had material business contact with BrightView's customers was located in the areas near Cincinnati that are south of I-70, north of I-275, east of US-127 and west of Rt. 68, as depicted in the following image:

**RESTRICTED TERRITORY**




Description of Restricted Territory: South of I-70; north of I-275, east of US-127, and west of Rt. 68.

44. As a Branch Manager at BrightView, Gabriel held a senior leadership position and was responsible for managing and directing the Company's branch operations in Cincinnati. In that role, Gabriel was entrusted with responsibility for the branch's day-to-day operations, business performance, customer relationships, employee supervision, safety compliance, and overall profitability. Gabriel was also responsible for the management of branch personnel, implementing

Company policies and procedures, managing operational resources, and ensuring that the branch operated safely, efficiently, and in accordance with Company standards.

45. Gabriel's responsibilities also included supervising the branch's operational teams and ensuring that services were delivered consistently, professionally, and at a high level of quality. Gabriel played a significant role in the Company's sales and business development efforts. Gabriel developed and executed business development strategies, managed and supported the branch's sales pipeline, participated in local marketing and networking efforts to cultivate new business opportunities, and retain existing customers.

46. Gabriel also had responsibility for the branch's financial performance, including revenue generation, expense management, billing, collections, forecasting, and profitability.

47. In sum, the Branch Manager position Gabriel held was responsible for leading the branch as a whole and for ensuring that the branch met the Company's standards for safety, service quality, customer satisfaction, employee performance, business growth, and profitability.

48. To enable Gabriel to do his job, BrightView supplied and gave Gabriel access to a tremendous amount of confidential information.

49. Throughout his tenure at BrightView, Gabriel had access to BrightView's Customer Relationship Management database ("CRM"). By using the CRM, Gabriel learned many types of client-specific data, including (a) the identities of the precise individuals at customer businesses who made purchasing and contracting decisions (such as a property/facility manger or chief engineer who cannot be easily identified through public sources without much time and effort); (b) the services that customers utilized; (c) their estimated annual spend; and (d) whether they were happy, unhappy, or had any service-related issues.

50. BrightView also shared other highly sensitive information with Gabriel, including its gross margin percentages; material and subcontractor markup percentages; the national rebates that BrightView receives from certain vendors; the identities of subcontractors who offer BrightView specialized pricing and the terms of such pricing; the identities of vendors who supply bulk and bagged salt and the prices they charge BrightView (a key factor for pricing snow removal services); BrightView's composite labor rates in and around Cincinnati; and the identities of customer prospects that BrightView is targeting.

51. Gabriel was also intimately familiar with BrightView's proprietary method of estimating costs and setting pricing for customer projects or maintenance contracts, and she knew BrightView's target profit margins for customer bids.

52. The branch in which Gabriel worked routinely held branch meetings that Gabriel led. During these meetings, the attendees shared information about business opportunities and customer issues, and Gabriel used that information to help him with his business development responsibilities for BrightView.

### C. Gabriel is Breaching his Agreement with BrightView.

53. Gabriel was terminated by BrightView on January 8, 2026.

54. Sometime after Gabriel was terminated, BrightView learned that Gabriel had visited the City of Mason's office, ostensibly to see if it had any job openings. The City of Mason is the largest customer of the BrightView branch that Gabriel managed. Since the City of Mason lists its job openings on its website, Gabriel had no need to visit its offices to inquire about a job. Instead, upon information and belief, the apparent purpose of Gabriel's visit was to maintain his relationship with this customer while he searched for a new job.



FP 64492998.1

55. BrightView has since learned that Gabriel accepted a job as an account manager at GroundSystems on or about May 11, 2026.

56. According to its website, GroundSystems is a "full service commercial landscaping" company, that provides landscape maintenance, snow & ice management, landscape enhancements, irrigation, and other services of the same or similar nature to BrightView. *See* https://groundsystems.net/

57. GroundSystems is a competitor of BrightView for providing landscape maintenance and snow removal services in the territory served by BrightView's Cincinnati branch.

58. GroundSystems is a Competing Business as defined by the Agreement.

59. GroundSystems has since confirmed that it hired Gabriel to act as an account manager servicing customers in the Cincinnati area.

60. In the commercial landscaping business, account managers have responsibilities to assist the company's business development team. Frequently, the accounts they manage are properties represented by a property management company that is usually the entity that engages commercial landscapers to provide services at the properties they manage. When a commercial landscaping company has an opportunity with a new property for the same property management company, the business developers at the landscaping company will consult all the account managers who handle existing accounts for that same property management company to ensure consistency across accounts and to otherwise share information that would be useful for pursuing the opportunity.

61. The branch offices of commercial landscaping companies also hold branch office meetings on a regular basis, with all account managers and business developers participating in the meetings to share information that is useful for pursuing business leads.

62. Even for the accounts assigned to them, account managers are expected to expand the services provided to the account. When an account needs new services beyond those covered by an existing contract, the account will sometimes put that "enhancement" work out to bid among competing landscape companies. Therefore, BrightView competes with companies like GroundSystems even when both have existing customers under contract.

63. As a result of these and other responsibilities, account managers participate, both directly and indirectly, in soliciting new business.

64. BrightView's attorney sent Gabriel a letter on May 20, 2026, to remind him of his contractual obligations, to demand that he provide information concerning his role and responsibilities with GroundSystems, and to demand that he disclose any ongoing contact with BrightView customers. A true and correct copy of BrightView's May 20, 2026 letter to Gabriel is attached hereto as Exhibit B.

65. Gabriel did not respond to BrightView's letter. After the deadline for a response passed, BrightView's counsel sent Gabriel an email to follow up on May 28, 2026. A true and correct copy of the email sent to Gabriel is attached hereto as Exhibit C. Gabriel did not respond to the email, either.

66. BrightView, again through counsel, also sent a letter to GroundSystems to ensure it was on notice of Gabriel's contractual obligations and to request information concerning Gabriel's position. A true and correct copy of BrightView's May 20, 2025 letter to GroundSystems is attached hereto as Exhibit D.

67. Counsel for GroundSystems responded in a June 1, 2026 letter which confirmed Gabriel's employment as an account manager, but claimed he was not in violation of his restrictive covenants. Despite several subsequent communications, GroundSystems has refused to provide a

description of the precise territory to which he has been assigned, beyond noting that he is working in the "Cincinnati area." A true and correct copy of relevant Email correspondence dated June 2 – 11, 2026, between counsel for BrightView, P. Greco, and counsel for GroundSystens, G. Kurcab, is attached hereto as Exhibit E.

68. Upon information and belief, and given the refusal of either Gabriel or GroundSystems to state with specificity the territory where Gabriel is working for GroundSystems, it is apparent that Gabriel is working for GroundSystems in his "Restricted Territory" as defined in the Agreement.

69. As such, Gabriel is in a position to make use of his extensive knowledge of BrightView's confidential information to not only propose new work to existing GroundSystems customers, but also to indirectly solicit business by assisting others to solicit new customers within his Restricted Territory.

70. Unless enjoined, Gabriel will continue to breach obligations owed to BrightView under the terms of the Agreement.

71. BrightView has sustained, and will continue to sustain, serious and substantial injuries for which there is no adequate remedy at law.

**Count I**
**Breach of Contract**

72. BrightView incorporates by reference the allegations of Paragraphs 1 through 71 as if fully set forth herein.

73. BrightView and Gabriel are parties to the Agreement, the Agreement is supported by consideration, and the restrictive covenants set forth therein are ancillary to the Agreement.

74. Gabriel separated from BrightView on January 9, 2026.

75. Gabriel is currently employed by GroundSystems.

76. GroundSystems is a Competing Business under the Agreement.

77. The services that Gabriel is providing for GroundSystem is substantially similar to services that he performed for BrightView during the last two years of his employment with BrightView.

78. Upon information and belief, the services that Gabriel is providing for GroundSystems is resulting, or will result in, the use or disclosure of BrightView's Confidential Information.

79. Upon information and belief, Gabriel has been assigned to work and is continuing to work for GroundSystems in a geography that includes the same territory that he covered as an account manager for BrightView's Cincinnati branch office.

80. The area to which Gabriel has been assigned to work and is continuing to work for GroundSystems falls within the geographic scope of the Restricted Territory under the Agreement.

81. Based upon Gabriel's employment in the Restricted Territory and the responsibilities of an account manager, Gabriel is a threat to directly or Indirectly (as defined by the Agreement) solicit, divert, appropriate, or accept business from one or more Customers with whom Gabriel had Material Business Contact during the last two years of his employment with BrightView.

82. By virtue of the foregoing actions, Gabriel has breached, and continues to threaten to breach, the non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement.

83. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are reasonable in duration, geographic, and substantive scope.

84. The non-competition, non-disclosure, and non-solicitation restraints that are set forth in Sections 3, 5, and 6 of the Agreement are no greater than necessary to protect legitimate interests of BrightView, including, but not limited to, its interests in protecting its goodwill and its Confidential Information.

85. As a result of the foregoing breaches of the Agreement, BrightView has sustained, and will continue to sustain, damages.

86. Unless Gabriel is enjoined from the foregoing conduct, BrightView will be irreparably harmed by the loss of goodwill, the disclosure and use of its Confidential Information, the loss of the benefit of its investments, and present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

87. In the Agreement, Gabriel agreed that BrightView would be irreparably harmed by his breach or threatened breach of the Agreement and that, therefore, BrightView is entitled to injunctive relief and any other equitable relief allowed by law. See Agreement at § 13.

88. In the Agreement, Gabriel agreed that his knowledge, skills, and abilities are sufficient to permit his to earn a livelihood satisfactory to him without violating any provision set forth in Sections 3, 5, and 6 of the Agreement. See Agreement at § 13.

89. The balance of equities and public interest factors favor BrightView.

## **Prayer for Relief**

WHEREFORE, BrightView demands judgment in its favor against Gabriel, together with the following relief:

A. an order granting preliminary and permanent injunctive relief to enjoin the use or disclosure of BrightView's Confidential Information as required by Section 3 of the Agreement;

B. an order granting preliminary and permanent injunctive relief to enjoin Gabriel, for one year, from engaging in conduct in breach of the non-competition covenant set forth in Section 5 of the Agreement, including, but not limited to, an order prohibiting Gabriel from providing the same or substantially similar services for a Competing Business in the Restricted Territory as those that Gabriel provided for BrightView;

C. an order granting preliminary and permanent injunctive relief to enjoin Gabriel, for two years, from engaging in conduct in breach of the non-solicitation covenant set forth in Section 6 of the Agreement;

D. an award of damages for such actual losses as may be proven at trial;

E. an award of attorneys' fees, costs, and interest as permitted by law; and/or

F. such other and further relief as this Court deems just and equitable.

Respectfully submitted,

*/s/ Andrew S. Gallinaro*

Paul J. Greco, Esquire
Andrew S. Gallinaro, Esquire
FISHER & PHILLIPS LLP
Two Logan Square
100 N. 18th Street – 12th Floor
Philadelphia, PA 19103
Tel. (610) 230-2146/2178
Fax (610) 230-2151
Email pgreco@fisherphillips.com
agallinaro@fisherphillips.com

Dated: June 26, 2026

*Counsel for Plaintiff BrightView Landscapes, LLC*

**VERIFICATION**

I, Craig Huston, verify that I am a Branch Manager with BrightView Landscapes, LLC and that I am authorized to execute this Verification on its behalf. I have read the Verified Complaint and the facts and information set forth therein are true and correct to the best of my knowledge, information, and belief. This Verification is made subject to 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

06/23/2026
Date

Craig Huston



FP 64492998.1